Good morning, Your Honors. May it please the Court. I am Amanda Phillips representing Appellant Mpay Inc. and I will use ten minutes to open and I reserve five minutes for rebuttal. Your Honors, we have five issues in our brief and we think that they all merit your attention, but the utterly decisive point and the one I would like to address first is this. The District Court erred when it failed to address the Appellee's unlawful sub-license of Mpay's software products to a third party named Haslar Mpay. This is the second of the two license violations that we raised in brief, but it is the most important and so I'm addressing it first. Your Honor, the contracts allow an LLC member, singular LLC member, to sub-license the use of the software product to third parties in which one LLC member has a majority ownership and voting control. The language involved here in this contract, it appears in the addendum at page 13 and it's section 5.4 and I'd like to direct Your Honor's attention to the section 5.4 in the addendum at page 13. The language, the plain text of this contract says for member sub-licenses, a class L or class S member will be entitled to sub-license the software to any entity in which such member owns A, a majority of the value of the equity and B, voting control. Except as set forth in preceding sentence, a member may not sub-license the software. And so Your Honor, the record shows despite this express language saying that except as set forth here, you may not sub-license the software, two LLC members admit and the record shows that they gave the use of the software product to this third party in which no LLC member has majority ownership or voting control. The district court failed to address this issue entirely. The district court focused only on the use of the software product versus possession of the source code, which is a separate licensing violation. We raised both in our briefs and we raised both at oral argument. We were not offered the opportunity for reply brief or we would have raised it in the reply brief as well. And the record that defendants, the appellees are saying that TASLR is jointly owned by two of the members. And again, we look to the plain text of the contract. The contract does not allow this. And why does this matter? It matters A, because we're interpreting the text of the contract. The text of the contract embodies the party's intent. If the party's intended to allow sub-licensing to joint owners, it would have said so and it does not say so. But more than that, the whole purpose of a license agreement is to control the use and the distribution of your software product. And if the purpose is so that a class L member who sub-licenses has complete control over the sub-licensee and can direct and monitor the sub-licensee's conduct with respect to the software products. And so there's several problems that can happen if you have 50-50 ownership. In fact, in this case, it might be 40-40 or 30-30. The defendants and the appellees are very ambiguous and vague about what the ownership in TASLR is. But they don't come out and say we have one class L member has a majority. They say we jointly have a majority. That violates the express terms of the contract with regard to the sub-licensing. And your honors, I'll turn next to the other error interpreting this contract as a matter of law by the district court. And this is really the first main issue that we briefed in the papers. The district court misconstrued this you know, so just for context, I know you've read the briefs and you're familiar. But just for context, MPAID develops the software. It owns the source code. It licensed only the source code to one party. And there are a series of four contracts that determine the rights and obligations of the parties. So again, I turn, your honors, to the contracts themselves. There are two licenses in play here. And if your honors look at addendum page 12, this is the member control agreement, which is the agreement between the members of the LLC here. The member control agreement defines at 1.20, section 1.20 at addendum page 12, there is such a thing called a member license, which is a license of a software to a member. And then at section 1.22, it describes the primary license, which is the license of the software to one point. So you have two licenses here. MPAID licenses the source code and the software product to one point. One point may then license the use of the software product to the members of the LLC. The license agreement itself has specific provisions governing both source code and the use of the software product. If we go to addendum page 15, this is the license agreement at issue here. Section 2A of the license agreement states that subject to the terms and conditions of this agreement, the licensor hereby grants to licensee a perpetual non-exclusive fully paid upon payment of the license fee and unrestricted right to use the software products for its business. This is the contract provision that the district court focused on and ignored the rest of the source code, which is a different thing than the software product. Again, software product, if you remember when software companies used to ship CDs, drink wrap, they would ship the CD to your computer, you would sell it on your computer, you would run that CD. That does not include the source code. The source code is the recipe for how you make the software. It is like the Coca-Cola secret recipe. Coca-Cola ships a product, it sells its Coke, it never ships its secret recipe. It keeps that secret recipe in the vault. This is what software companies do. My understanding, at least part of the purpose of the agreements in their various forms was that one point was going to then make some changes and enhancements to the product. To do that, it seems to me you have to have the recipe. You're going to add a little more vanilla or something to the recipe. Why wouldn't that necessarily imply that they're going to use the source code and perhaps even be sharing it with other people who are going to help them make those enhancements? Yes, your honor. The agreement does allow one point to possess the source code and make enhancements. It does not allow one point to transfer the source code to any other party, including the members of the LLC. What they've done here is one point has transferred the source code to the members of the LLC, and that is in violation of the license agreement. This blurs the line between one point and the members. They do this often. If I'm a member of a country club, I have the right to go to the country club and use the golf courts while I'm there. The country club owns the golf courts, and I can't take the golf cart home with me. This is the analogy here. One point owns the source code to develop enhancements and modifications, but it cannot give the source code to the members of the LLC. One point is the entity to run the business. It's up to the members. That's why the parties have these contractual arrangements to protect the members within the confines of the LLC. If we didn't want one point to exist, I suppose we could have licensed the source code directly to the defendants, directly to the LLC members. That's not what the parties did here. They created this entity, one point, to use the source code to develop the software. On that point about the enhancement, I'm glad you asked. I do want to turn to the definition of enhanced software products in the contracts. If your honors would look at, we're looking at addendum page 14. Section 1D defines enhanced software products, your honors. And it states that enhanced software products mean the modifications, enhancements, or improvements of the software products. Only those modifications, enhancements, or improvements. That does not include the underlying payroll software, which M-PAY still owns. And then, you know, phase one and phase two are also defined here in the same section. Phase one just means it was developed before phase two. And phase two says it was developed during phase two. So that's clear. But enhanced software products, what one point owns is only the modifications. It cannot do whatever it wants with the underlying source code. It owns the modifications. This was reaffirmed, your honor, when the parties signed the 2003 letter agreement. This is also in the addendum, your honor. And the addendum on page 22, again, states that one point will own the additions and modifications only. And it does not own the underlying software itself. So the district judge did not look carefully at these definitions and conflated the two and concluded that one point owns all of it. It does not. One point has, we have several provisions in the contracts that allow one point to transfer the source code to anyone outside of one point, including the members. And your honors, I would like to rest on my briefs for the rest of my points and I'll reserve the remainder of my time for rebuttal. Thank you. Very well. Thank you, Ms. Phillips. The court will now hear from Mr. Miller. Thank you, your honors. May it please the court. The standard of review, both at the lower level and at this level, need to be addressed. Number one, basic Hornbook law, preliminary injunction, is an extraordinary remedy and not routinely granted. We now are at a level where the analysis of Judge Magnuson's decision is assessed as to a clear error or abuse of discretion of a determination that this extraordinary remedy should not be applied in this case. And there's just nothing of the sort in terms of the errors of law or errors of fact that have to be assessed. Mr. Miller, would you address what the record shows about the members of TASLR? The record shows the original argument about TASLR made in the moving papers in the lower court was that TASLR has the source code and they shouldn't have the source code. And the sworn response to that is, no, they don't. They don't have the source code. And that's why council led with it because it's really an argument that wasn't presented in the original papers as well. TASLR is owned by two of the members of one point, and either one of them could own a company to license the product. But if two of them own a company, it's not an agreement. The evidence before the court is that TASLR does not have the source code and that TASLR is owned by two of the members of one point. But the district court didn't address this issue at all, did it? Well, not specifically. TASLR was not a big issue in the underlying court. The whole sub-licensing issue wasn't dealt with by the district court. It was not addressed in its written opinion for sure, and I would suspect that that's probably because the actual software license agreement itself specifically allows the use of the software, which is one point, by its members, which would include Erie and Payroll World and ProLiant and any third party. The actual license agreement between M-Pay and one point allows non-exclusive, fully played and unrestricted right to use the software products for the licensee, one point, its members, and any third party. That's paragraph 2A of the software development agreement. The quote, the site I have for it is in the original papers. This is after the joint appendix 143 is where paragraph 2A is. So I suspect that the district court didn't pay a lot of attention to the membership disagreement because in the primary licensed document, it's allowed to go to TASLAR. And TASLAR has for years paid its two cents per check. You know, there will be an interesting waiver and estoppel when we actually get to trial. TASLAR has been paying a license fee as a user of the software product under the terms of the software development and license agreement. So what TASLAR is doing is directing back to what would essentially be a squabble within the LLC itself by looking at the member agreement. And the member agreement is, allows for escrow of the codes for the benefit of the company's members. This notion that there's a difference between one point and its members is belied by paragraph 5.6 of the member agreement. But the agreement also allows this sub-licensing if you own the company. So council's created a scenario where if it's 50-50, what if one of them withdraws from its membership in one point? And the answer is the same as if it were 100% owned and one withdrew from the membership. Either way, something would have to be changed. I don't know if I've been able to answer that question. The last focus was on the license agreement because the license agreement is our defense to the copyright claims in this action. It's a pretty good defense. We've been for 20 years, one point has been using these products for 20 years. It's had the source code because it was given to us by M-PAY as part of the deal. M-PAY's only contribution to the LLC is the software and source code. Everybody else gave cash. M-PAY, there's a cash amount assigned to it, but M-PAY's contribution to this LLC is the source code and the use of the software. And in fact, paragraph 5.6 allows the source code, this part that says, well, you're going to hold on to this source code in escrow, it allows just the class L members, two out of three of them, to change how the source code is held. That's kind of an in-house issue. So we have a claimed breach of the membership agreement, like, well, you know, is it, if it's owned by two members, is that really the same as being owned by a member? And that's an issue I guess we can address at trial if we need to. But our defense to the claims of copyright infringement is the fact that we are licensed users under the software development and license agreement, and that agreement allows the licensing to one point members and all third parties. One of the things I want to point, is that okay if I answered your question, your honor? Yes, you may proceed. One of the things I want to stress is exactly what is being asked for or was asked for in the underlying court. The district court was asked to enjoin the LLC members at one point from using, disclosing, distributing, or making derivative works of the MPA software. And there's two places that appears in the record, Joint Appendix 192, which is essentially their prayer for relief in the motion, and 241, which is the proposed order they submitted to the court. Now, there's a whole bunch of other things they want to enjoin, but that's number one, and that's the one that caught our eye. So we have a license agreement that's been in force in effect for 20 years that allows us the opportunity to use the software, self-license the software, use the source code, and make derivative works. 20 years that's been in force in effect, and the request in this underlying motion for preliminary injunction was to take all that away. Let's just, to keep the status quo, and I'm using air quotes if it stops these three members at one point from doing their job. What does that mean? Well, what that means is that this, you know, everybody at these companies, our companies, are trained on how to use this product, and we've got that product out there. Our licensees are employers who have varying amounts, you know, anyway, from a handful of employees to thousands of employees. They've all been trained on how to use this software, and just one day, let's just stop it. Can't do that anymore. We would have to get alternate software. We'd have to get trained on the software. We'd have to train our employers on the software. The reality is it can't be done. It can't be done overnight. In the declarations of Messrs. Clayton and Starr and Lee, it'd take 45 days to two months to just get this done. It would just essentially mess up the payrolls for all the companies that are counting on my clients to produce the same product they've been producing, mostly since 2008, since that's when the enhanced software was implemented. It doesn't make, that's as draconian as a result as can happen, and it's as far from the status quo as can be. So when we have a remedy that is considered to be extreme to begin with, we have, and it's not routinely granted, when we have parties that have paid significantly, the buy-in for just the three clients I represent in this litigation was over a half million dollars just for the use, and that's not counting the originally eight cents per paycheck charge and the now-continuing post-phase two, two cents per paycheck charge. We've got millions and millions of dollars spent to have the right to use these products as we're using them, to have the right to develop software, enhance software beyond the original Coca-Cola product, and your honor is exactly correct in terms of what it entails. You don't just add something to the vat of Coke, and now you've got to know the source code. That's why the source code was voluntarily transferred from none of its members can look at it or use it. It makes no sense at all. Someone's got to grab it, and someone's got to do something with it, and in fact, it was the members who have done the enhancement. It's all stayed in-house. In their reply brief, counsel essentially has conceded or stated that the additions and enhancements don't run by themselves. This is page 10 of the reply brief. Additions and enhancements don't run by themselves. They necessarily rely on the base source code that M-Pay owns, and your honor, your question was well directed. You can't enhance the product without using the source code. That's the deal. That was the deal. That's the primary deposit that was made by M-Pay into this LLC, so when the trial court or district court says, this is from the opinion of the court, while M-Pay contends the use of the software does not include providing the underlying source code to others, the license agreement allows one point to develop enhanced software products based on M-Pay's software, which must necessarily entail providing the source code to others. Judge Magnuson came up with the same understanding and conclusion that Justice Scrunger has right here. The extreme nature of the relief sought, when considered in light of the fact that the, I mean, what they're doing is they're saying, a couple weeks before we filed for that 20-year source code, you have the source code, so clearly you must have copied it. We don't have to prove irreparable injury. There you go. We win. And the reality is, that's not what happened. They transferred the source code to us as part of the deal. The license agreement allows us to license it to members and third parties. The license agreement actually refers a paragraph to me at Joint Appendix 144 that we're going to provide complete copies, plural, source code for all software products, and at least one copy will remain in escrow. They anticipated there would be multiple copies. They anticipated that the escrow had only one. Also, I direct the court's attention to Joint Appendix 145, where the discussion of who owns the Phase 2 and the fact that the aspect of Phase 2, which is the enhanced product that really all the dependents are now using, the Phase 2 products, the contribution of MPAE to the Phase 2 products are actually considered able or higher by MPAE, what their contribution is to that. Anyway, unless your honors have any other questions, I'm happy to rest. Hearing none, thank you, Mr. Miller. Ms. Phillips, I believe you have some rebuttal time. Thank you, your honor. Your honor, Mr. Miller did not answer your question about what the record says about Tesla ownership, and so I just want to direct your honors to the record at page 259 of the appendix, the footnote in your brief that says, L class members, Erie Custom Computer Applications and Payroll World owned a majority of Tesla and had voting control. So, again, they say they jointly owned it. That footnote in their brief cites two provisions in the record that say at page 274 of the appendix, one of the sworn declarations says, again, that Tesla Inc. is a California corporation in which the majority control, including equity ownership and voting control, is held by L class members, Payroll World, and Erie. The second citation says essentially the same thing, and so they are saying here that they jointly own. They do not come out and say, one L class member owns majority control. They don't come out and say it because they can't, right? And so we have to parse their statements very carefully. We have since learned that it's not even 50-50, again, and I say that not because I want to go outside the appendix. I just say that because I want you to take their sworn statements and parse it carefully because they're somewhat misleading as they read. So the other thing that I wanted to mention, Your Honor, is that we definitely raised this TASLR issue below in the brief. At the appendix, page 180 in our brief, we discussed the TASLR issue, and the two affidavits in support of the brief both discussed the TASLR issue at appendix 196 and appendix 198. It was definitely clearly raised below. Again, Your Honors, we were not offered the opportunity for a reply brief. We had 20 minutes of argument per side. We had no opportunity to put witnesses on at the preliminary injunction hearing, and so, you know, since we had no opportunity for the reply brief, you will see that MPAE raised this in the transcript and in a slide deck. The transcript is at page 592 of the appendix, and the slide deck is at page 627 of the appendix, and we presented that slide deck to the trial court. I'll also note that Mr. Miller is entirely focused on one point's rights. In his argument just now, he conflated one point and the members. He said, well, we have the source code. We were using it. We had to develop the software. Well, no, that's why you set up this LLC, one point. One point has the right to possess the source code. One point needs to observe corporate formalities with which we're all familiar with. One point can support independent software developers. The contracts all allow for that, but it says one point may do it, not the members, and Mr. Miller, in his briefs and in argument just now, focused again on what one point's rights were, not what his clients, the appellees' rights are as L-Class members. The last thing that I just wanted to mention was Mr. Miller mentioned, you know, the harm that results from this if an injunction enters. The Eighth Circuit controlling precedent is that irreparable harm is presumed in copyright infringement cases. The Eighth Circuit has not disturbed that precedent. They cite an environmental case from California where they're trying to save the marine mammals as, you know, as calling this into question. It absolutely did not. The controlling precedent must be applied. If there is a likelihood of merits, then copyright infringement, irreparable harm is presumed, and a willful infringer cannot be heard to complain about, you know, building an entire business off of stolen software and then complain about the harm when that stolen software is returned to its rightful owner. So thank you, Your Honors. We ask that you enforce the contracts as written. That is an issue of law that this court may address and that the court reverse to enter the injunction. Thank you, Your Honors. Ms. Phillips and Mr. Miller, the court appreciates your appearance today and you're working with us to do it by video. We have briefs. We thank you for the argument today and the case is submitted and will be decided in due course.